UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION


SCHOOL BOARD OF LEE COUNTY, FLORIDA,

        Plaintiff,

-vs-                                      Case No.  2:05-cv-5-FtM-29SPC

M.M *on behalf of M.M. II, a minor;* J.M. *on behalf of M.M. II, a minor,*

        Defendants.

_____/

M.M. *and* J.M., *on behalf of* M.M. II, *a minor,*

        Plaintiff,

-vs-                                      Case No. 2:05-cv-7-FtM-29SPC

SCHOOL BOARD OF LEE COUNTY, FLORIDA,
and VIVIAN POSEY, an individual,

        Defendants.

_____/

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

_____This matter comes before the Court in Case No. 2:05-cv-5-FtM-29SPC on Plaintiff School

Board of Lee County ("School Board"), Florida's Amended Complaint (Doc. #7) filed on January

25, 2005, and the Plaintiffs' M.M. and J.M ("the Parents"), on behalf of M.M. II, a minor, Complaint

(Doc. #1) filed on January 6, 2005.  The matter was referred to United States Magistrate Judge Sheri

Polster Chappell by the Honorable John E. Steele, District Court Judge for the Middle District of

Florida for a Report and Recommendation regarding the portion of the Complaint dealing with the Individuals With Disabilities Education Act ("IDEA").

Pursuant to 20 U.S.C. § 1415(i)(2) the parties are requesting a *de novo* review of the Final Order of the Administrative Law Judge ("ALJ") of the Florida Division of Administrative Hearings ("DOAH") which was entered on December 7, 2004, following a hearing which lasted fifteen days over a period of three months.

This Court has received the record of proceedings in the DOAH hearing, along with the Proposed Findings of Fact and Conclusions of Law submitted by both the Parents and the School Board (Doc. #'s 26 and 28) filed on August 9 and August 10, 2005.[1]  Although the School Board proposed to offer additional evidence which was objected to by the Parents, on July 13, 2005, this Court denied that request.   The two cases have been consolidated and are now ripe for review.

Based on a review of the record and the parties' submissions, and with a consideration of the appropriate deference to be given to the ALJ's decisions, as well as the deference to be accorded the decisions of educational professionals, the Court now issues its Findings of Fact and Conclusions of Law.

<u>FACTS</u>

The Lee County School Board   is a body corporate and governmental agency duly empowered by the Constitution and Statutes of the State of Florida to administer, manage, and

---

[1] The School Board of Lee County, Florida ("School Board") is the Plaintiff in Case No. 2:05-cv-5-FtM-29SPC, but is the Defendant in Case No. 2:05-cv-7-29SPC.  Similarly, in Case No. 2:05-cv-5-FtM-29SPC, M.M., J.M. ("Parents"), and M.M. II ("M.M.") are the Defendants, but are the Plaintiffs in Case No. 2:05-cv-7-FtM-29SPC.  For ease of discussion, the parties will be referred to as the "School Board" and the "Parents" or "M.M.", rather than as Plaintiff or Defendant.

operate the Lee County Public Schools within the School District of Lee County, Florida.  (Final Order, Dec. 7, 2004, p. 200, ¶1)[2] The School Board receives state and federal funding for education, including education for disabled students.  (FO p. 200, ¶ 1)   M.M.  who was born on December 31, 1996, is a student in Lee County and was seven years old at the time of the hearing.  (FO p. 200, ¶2) He has at all times material to the issues in this case been enrolled in the Three Oaks Elementary School ("TOES"), Lee County School District, in a regular education classroom (FO p. 201, ¶ 4). M.M. would normally attend TOES if he did not have a disability. (FO p. 201, ¶ 4). M.M. has historically been identified as a student with disabilities under the Individuals with Disabilities Education Act ("IDEA") (20 U.S.C.  § 1400 *et.seq.*), and has consistently been eligible for services under the IDEA.  (FO p. 200, ¶ 2).  His disabilities are:  Specific Learning Disability, Speech Impaired, and Language Impaired. (FO p. 201, ¶3).  M.M. also suffers from attention deficit hyperactivity disorder ("ADHD") and microcephaly.[3]  (FO p. 201, ¶ 3).

The ALJ found three IEPs material to the proceedings.  The Parents and the School Board jointly developed an IEP dated February 28, 2003, that is identified in the record as the existing IEP, the Kindergarten IEP, or the stay-put IEP.  The School Board completed an IEP on February 19, 2004, that is identified in the record as the proposed IEP or the challenged IEP, and the School Board completed an IEP on April 28, 2004, that is identified as the modified stay-put IEP. (FO p. 201, ¶ 5).[4]

---

[2]References to specific paragraphs in the Final Order issued on December 7, 2004, Index Vol. 2, 198-227, are designated herein as "FO p.(no.), ¶ (no.)."

[3]Microcephaly is a condition in which the head, including the mouth, is unusually small. (FO p. 201, ¶ 3).

[4]It is clear that the Parents were present during the IEP discussion, however, they contend that they were not in agreement
(continued...)

M.M.'s Parents agreed with the Kindergarten IEP of February 28, 2003 ( T 7/13/04, p. 39)[5], and did not challenge it through any proceeding.   M.M. has had other IEPs, but they have only historical significance. [6]

During his kindergarten and first grade year, between October 28, 2002, and February 19, 2003, M.M. displayed behavioral problems.  On or about February 28, 2003, following this pattern of behavior problems, the Parents and Staff of the School Board developed the existing IEP dated

---

[4](...continued)
with the IEP's of February 19, 2004, and April 28, 2004.

[5]The transcripts of the proceedings which were held over a period of fifteen days, (Index, Vol. 1, Attachment 1)are designated herein as follows: T (date of hearing),(page no.).

[6] The School Board first provided educational services to M.M. in an Early Intervention Program.  He was evaluated at the time and identified as being developmentally delayed.  The First IEP was developed on December 9, 1999 when M.M. was approximately three years old.(FO p. 201, ¶6).
Between December 9, 1999, and May 23, 2002, M.M. experienced regression during extended interruptions in educational services. An IEP was jointly developed by the School Board and the Parents on May 23, 2002 for extended school year services during the summer between the 2001-2002 and 2002-2003 school year. (FO p. 201, ¶ 7).
In August of 2002, M.M. enrolled in kindergarten at TOES for the 2002-2003 school year.  Between August 2002 and October 28, 2002, the School Board provided educational services to M.M. pursuant to the IEP for the preceding school year dated May 23, 2002.  On October 28, 2002, the parties jointly developed another IEP intended to operate for the remainder of the kindergarten school year. (FO p. 202, ¶8).

February 28, 2003.  (FO p. 203, ¶ 13; T- 5/11/04, p. 153).[7]  At that time, it was noted that M.M. was

on grade level in all academic areas. ( Pet. Ex. A [000062]; Pet. Ex. H[000062]).[8]

Prior to the 2003 summer break, the Parents noticed that M.M. was showing signs of

regression and requested extended school year (ESY) services. (T-5/11/04, p. 153 - 154.)  However,

the School Board did not offer or provide ESY services to M.M. during the 2003 summer break.

(Pet. Ex. A-9 [000079]; T-5/11/04, p. 154-156).

During the summer of 2003, the Parents noticed that M.M. was regressing, notified the Board

of their concerns, and requested that the Board ensure that M.M. had sufficient services to receive

educational benefit when he returned to TOES in the fall of 2003. (Pet. Ex. H [000378 - 000379,

000381, 000386; T-5/11/04, p. 159-160).

On September 4 and 16, and October 16, 2003, personnel employed by the School Board  met

with the Parents to discuss the Parents' concerns regarding M.M.'s progress and the School Board's

response to M.M.'s needs.  Prior to these meetings, the Parents had expressly requested to revise the

February 2003 IEP. (Pet. Ex. H [000384, 000388]; T-5/11/04, p. 165 - 170).

At a   September 4, 2003, Parent Conference, the topics discussed included the

commencement of a functional behavior assessment (FBA) leading toward a behavior intervention

---

[7]Present for the IEP Staffing were the Parents, an LEA representative, Dr. Vivian Posey, the Principal of TOES, Amy Germer, teacher, Allison Fortuna, Behavior Specialist, Jan Porter, Counselor, Sally Walker, Speech Pathologist, Mary Fellenz and Ronna Miranda, Occupational Therapists. (Pet. Ex. H [00067]).

[8]References to the School Board's Exhibits, Index, Vol. 1, Attachment 1, are designated herein as "Resp. Ex. (Number)." References to the Parent's Exhibits, Index , Vol. 1, Attachments 1 and 2, are designated herein as "Pet. Ex. (Letter)." References to the Bates Stamp numbers on documents are designated herein as "[XXXXXX]."

plan (BIP). (Pet. Ex. H [000391]).  At a September 16, 2003, Parent Conference, the meeting minutes (Pet. Ex. H [000395-000396, 000402] ) reflect that among other topics, permission was then given for the FBA and a reevaluation to be conducted, and an IEP staffing was to be scheduled when the reevaluation by the psychologist had been completed.

At an October 16, 2003, meeting, the parties discussed the observations of the group at that time regarding M.M.'s need for one-on-one assistance with all written tasks (Pet. Ex. H, [000045]); the appropriateness of M.M.'s behavior when in a specific learning disabilities (SLD) resource room (Pet. Ex.  H [000045]; M.M.'s preference for small group activities (Pet. Ex. H [000045]; and M.M.'s propensity for impulsivity and behaviors which seek adult attention. (Pet. Ex. H [000046]). It was also noted that M.M. was easily overstimulated in large group settings, and that he was reacting negatively when in a situation which provided less support than he required. (Pet. Ex. H [000046]).  Although the Parents thought that the changes discussed would be to the IEP,  (T-5/11/04, p. 174), the School Board completed a "Parent Conference" Form. (Pet. Ex. H [000045]; T-5/11/04, p. 164 - 174).

On October 21 and 23, 2003, M.M. was given a Psychological evaluation (Pet. Ex. H [000033-000038] that assessed his full-scale IQ at 90.(Pet. Ex. H [000035].  The examiner,  Peter Piro, School Psychologist, believed that M.M.'s cognitive skills, although measured at the cusp of low average to average,  are probably higher.  (Pet. Ex. H [000037]).

The next Parent Conference was held on November 6, 2003, for the purpose of addressing questions posed by the Parents. (Pet. Ex. H, [000042-000044].  It was noted at the end of the meeting that the next session would be the IEP staffing. (Pet. Ex. H [000044]; T-5/11/04, p. 176).

On December 18, 2003, the IEP staffing conference was convened.  This staffing included

members of the school staff and the Parents.[9]   At that time, it was noted that M.M. was continuing to encounter academic and behavioral problems in the classroom, but was performing well when receiving instruction at his individual level in a specific learning disability (SLD) classroom. (Pet. Ex. H [000029]).   Upon discussion among the participants, it was decided that M.M. needed more services than were being provided under the  then in place Kindergarten IEP.  (Pet. Ex. H [000017 and 000029]).

The Meeting Minutes for December 18, 2003, reflect that there was a possibility of a change of placement to Varying Exceptionalities (VE). (Pet. Ex. H [000029]).  The Parents requested time to seek medical advice regarding M.M. and ADHD.   (Pet. Ex. B-12 [000029]; T-5/11/04 p. 187). That request was honored, and it was decided that the meeting would be adjourned for eight weeks in order to further assess the appropriate level of services. (Pet. Ex. H [000029]; T-5/11/04, pp. 187-190).

On December 18, 2003, the Parents presented a report to the IEP team from Dr. David Delesio[10] that recommended M.M. receive vision therapy.  (Pet. Ex. F-10 [000214-000218]; Pet. Ex. H [000771-000775]).

The Parents requested and were permitted to view the VE programs offered at various schools in the District. (Pet. Ex. B-13 [000433]; Pet. Ex. H [000017}; T-5/11/04, pp. 188-190; T-

---

[9]Present for the Staffing were the Parents, Linda Palmer, ESE Teacher, Janet Pineau, Teacher, Jan Porter, Guidance Counselor, Peter Piro, Psychologist, Allison Fortuna, Behavior Specialist, Jennifer Black, Speech Therapist, Ronna Miranda, Occupational Therapist, and Teresa Myles, Consultative Teacher.  (Pet. Ex. H [000018]).

[10]Dr. Delesio is a licensed Optometrist.  He was accepted, without objection , as an expert in the field of Optometry with a specialty in Vision Therapy. (T-6/9/04, p. 189 - 192).

6/9/04, pp. 95-114).  Each of the schools was set up differently and used different methods of delivering services.  The Parents felt that none of the VE options were all inclusive or small group. (T-6/16/04, p. 40-45).

The Parents obtained a doctor's appointment for M.M. and the doctor prescribed ADHD medication which M.M. began taking on February 18, 2004. (T-5/11/04, pp. 185-186; T-6/10/04, p. 71).

On February 19, 2004, the IEP team reconvened at which time the team completed the IEP which had been started on December 18, 2003.  According to M.M.'s father, the meeting lasted approximately 2 ½ to 3 hours. (T-6/9/04, p. 169).   It was reported that there had been little change in classroom behaviors, and that what change there was appeared to be negative.  It was noted that there was an increase in negative behaviors and "meltdowns."  In addition, handwritten notes of the meeting reflect discussions of M.M. becoming resistant to leaving his classroom for the SLD services he was receiving, possible retention in first grade, a perception that M.M.'s primary educational need was to be taught in a small group setting; and the feeling that a decision on these issues needed to be made.  (Pet. Ex. H [000424-000425]).

Further, the Meeting Minutes reflect that all members of the team (including the staff of the School Board and the Parents) agreed that the current array of services was not sufficient to assist M.M. in making progress. (Pet. Ex. H [000017].  The school based professionals agreed that a change to VE would be appropriate.  (Pet. Ex. H [000017]).  However, the Parents had great concerns about the strength of the VE programs that they had visited.  (Pet. Ex. B [000433]). M.M.'s father requested the IEP consider using 1:1 aide for M.M. (Pet. Ex. B [000433])

The Parents requested information regarding the specific schools to which M.M. could be moved at that time. (Pet. Ex. H [000017]).   Thereafter, the Parents determined that they wished to have M.M. placed in a VE class at Orangewood Elementary School.   However, they were informed that M.M.'s placement was going to be decided by "School Choice"[11], not by the IEP Team since Orangewood Elementary School was not in M.M.'s School Choice Zone.   On March 3, 2004, the Parents requested a due process hearing for the stated purpose of preventing any reassignment of schools.[12](Index, Vol. 1, at 002-003; Pet. Ex. H [000006-000007, 000193-000194].

On March 4, 2004, the School Board informed the Parents that on March 12, 2004, the School Board was withdrawing M.M. from TOES.   (Pet. Ex. E - letter of 3/4/2004;T-5/11/04, p. 180).   The Parents objected to any change in status and demanded "stay put."   (T-5/11/04, p. 180).

On March 5, 2004, M.M.'s mother sent another handwritten letter to the principal of TOES, stating "I would like to meet...to find out how you will be implementing M.M.'s new IEP until his placement issue is resolved...  Also, how do you plan to accommodate his small group instruction?" (Pet. Ex. H [000192]).

M.M.'s mother testified at the DOAH hearing that despite her representations at the meeting on February 19, 2004, that M.M. had begun taking medication for ADHD on the day prior to the

---

[11]School Choice is a random assignment of a student to a school without taking into consideration the nature of the disability based upon the zone that the child lives in at the time. (T-6/16/04, p. 53).

[12]The letter, dated March 3, 2004, specifically stated that :"... we do not consent to [M.M.'s] withdrawal from Three Oaks Elementary School until placement in Orangewood's program can be guaranteed.   Until this issue is resolved I am requesting all services specified on [M.M.'s] IEP commence, immediately, at your school."  (Pet. Ex. H [000193-000194]).

IEP meeting. (T-5/11/04, p. 185).  She further testified that in accordance with medical advice, she had withheld from the school personnel information regarding the specific date for commencing the medication program. (T-5/11/04, p. 186).

However, after the Parents filed for due process, M.M.'s teacher noticed a change in his behavior.  There was remarkable improvement in M.M.'s classroom behavior and performance, and M.M. himself told his teacher that he was taking medication. (T-6/22/04, p. 144).  The Parents also noticed that the medication was having its intended effect of helping M.M. to focus in the classroom and to stay seated (T-6/9/04, p. 181), and that the medications had so significantly changed his behavior for the better that a review of the continuing viability of the disputed IEP was appropriate. (T-6/10/04, p. 52).

The improvement in M.M.'s behavior was so noteworthy that his teacher was able to work with M.M. in a productive manner, and no longer felt a need to move him to a VE setting.  In early March his teacher reported to Dr. Vivian Posey the principal of TOES that she felt the improvement in M.M.'s behavior was such that he could be successfully served in her classroom, and that the move to VE might be unnecessary.  At that point, the IEP team reconvened to consider the change in circumstances, and commenced the process of preparing a new IEP to address M.M.'s changed needs.

On March 5, 2004, the School Board referred the matter to DOAH to conduct the due process hearing. (Pet. Ex. H [000005]).  On March 8, 2004, the School Board again informed the Parents that on March 12, 2004, the School Board was withdrawing M.M. from TOES. (Pet. Ex. E - letter of 3/4/2004).

On March 12, 2004, the Parents, through their attorney, submitted the "Revised Issues for a Due Process Hearing" ("Revised Issues") (Index, Vol. 1, at 0004-006).   On March 19, 2004, the School Board filed a Motion to Strike or for a More Definite Statement with Regard to the Revised Issues (Index, Vol. 1, at 010-012).  On March 25, 2004, the ALJ amended the Notice of Hearing and noted that the issues would be the Revised Issues.  On March 26, 2004, the School Board filed a Motion to Reschedule the Final Hearing, (Index,.Vol. 1, at 013-020).  On April 1, 2004, the ALJ granted the School Board's Motion for a Continuance and rescheduled the hearing for April 14-16, 2004.  (Index, Vol. 1, at 021-023).  On April 6, 2004, the parties stipulated to a continuance until May 11-13, 2004. (Index, Vol. 1, at 024-026).

Throughout the month of April, 2004, the parties held a number of session, for a total of approximately 28 hours (T-5/11/04, p. 205), and prepared an IEP which called for M.M.'s then current placement to remain unchanged, and withdrew the previously proposed change to a VE placement. On April 28, 2004, the School Board determined that it would implement the April 2004 IEP.   The Parents take the position that they did not agree to the implementation of the April 2004 IEP, but they also did not challenge it through a due process proceeding, either in this case or by any separate filing.

On May 3, 2004, the Parents submitted a "Second Amended Notice of Issues," (Index, Vol. 1, at 042-045)  which did not include disputes regarding the April 2004 IEP.  (FO ¶ 26).  On May 6, 2004, the School Board filed a "Motion to Dismiss for Mootness, To Strike Petitioners' Second Amended Notice of Issues or for Continuance of Final Hearing." (Index, Vol. 1, at 032-035).

On May 11, 2004, the evidentiary hearing commenced . (FO p. 208,  ¶ 28).  The first day of the hearing was limited to factual issues relating to jurisdiction.  (FO p. 208,  ¶ 28).   On May 12,

2004, at the request of the parties, the ALJ recessed the due process hearing to afford the parties an opportunity to resolve their differences.   On May 13, 2004, the parties entered into a partial settlement agreement. (FO p. 208,  ¶ 29).

Thereafter, the DOAH hearing was in recess until June 8, 2004.   The ALJ continued to conduct the due process hearing of this case from June 8-10, 14-16, 22-23, and July 12-15, 20, 23, and 26, 2004.

## ALJ's FINDINGS

The ALJ found that the existing IEP was neither designed nor implemented to adequately address the unique educational needs of M.M. during the first grade.   The proposed IEP was not designed to adequately address the unique educational needs of M.M. during the first grade.   The School Board committed procedural violations.   The educational progress M.M. made in the latter part of the first grade after he began medication, while the IEP deficiencies and procedural violations were operative, precludes a finding based on a preponderance of the evidence that the deficiencies and violations, either jointly or severally, prevented M.M. from making educational progress during the portion of the first grade that preceded the start of medication.   (FO p. 224-225).

It should be noted that although the ALJ wrote a thirty page order in this matter, he failed to cite to the record to substantiate any of his findings.   He made findings of fact and weighed the credibility of testimony, however, he did not cite to the record nor did he provide an analysis as to why he found one witness more credible than the next.

## THE LAW

## STANDARD OF REVIEW

Pursuant to the IDEA and the companion Florida Statutes,[13] the School Board must provide

the disabled child with a "free appropriate public education" ("FAPE")[14] designed to meet his unique

needs. Walker County School District v. Bennett ex rel. Bennett, 203 F.3d 1293, 1294 (11th Cir.

2000). FAPE does not mean that the School Board must provide service that will maximize a child's

potential, nor does FAPE mean that the School Board must provide the best possible education as

if its resources were unlimited. M.M. ex. rel. C.M. v. School Board of Miami-Dade County, 437 F.

3d 1085, 1102-1103 (11th Cir. 2006) (holding that a FAPE need not be the best possible education

nor one that will maximize the child's educational potential)); JSK v. Hendry County School Board,

941 F.2d 1563, 1573 (11th Cir. 1991) (holding that  maximum improvement is never required)).

Integral to the concept of an "appropriate" education is the notion that the services provided

must be tailored to serve the individual needs of the child.  To insure that each child's individual

educational needs are met, the school and parents work together to develop an individualized

education program. ("IEP").

---

[13]Section 230.23(4)(m) of the Florida Statutes was enacted, and Rule 6A-6.03311 of the Florida Administrative Code was promulgated to carry out the mandates of the IDEA. The relief is identical to the relief available under the IDEA.

[14]The IDEA defines "free appropriate public education" as "special education and related services that - - (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State education agency,(C) include an appropriate preschool, elementary, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of [the IDEA]." 20 U.S.C. § 1401(8).

If the parents and school cannot agree on the contents of the IEP, either party may request a due process hearing.  In Florida, due process hearings are conducted by an administrative hearing officer of DOAH.  Fla. Stat. §230.23(4)(m)(4).  The DOAH decision is a final order which entitles a party adversely affected to bring an action in either a federal district court or a state court of competent jurisdiction. 20 U.S.C. § 1415(e)(2); Fla. Stat. §230.23(4)(m)(4).

The issue before the Court, whether an IEP provided a FAPE,  is a mixed question of law and fact and therefore subject to a *de novo* review. Sch. Bd. Of Collier County vs. K.C., 285 F.3d 977, 979 (11th Cir. 2002).  The Court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C.A. §1415(i)(2)(b).

The Supreme Court has established a two-part guideline for review regarding suits brought under the IDEA.  Doe v. Alabama State Dept of Educ., 915 F.2d 651, 655 (11th Cir. 1990) (quoting Hendrick Hudson Cent.Sch. Dist. Bd. Of Educ. v. Rowley, 458 U.S. 176, 206, 102 S. Ct. 3034,73 L. Ed. 2d 690 (1982)).  Specifically, the Court must inquire:

> First, has the State complied with the procedures set forth in the Act: And, second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?  If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

Rowley, 458 U.S. at 206-07.

Under Rowley, the reviewing court must give "due weight" to the established record of the administrative proceeding.  Id. at 207.  The amount of deference to be granted the administrative decision is left to the discretion of the district court.  Jefferson County Bd. Of Educ. v. Breen, 853

F.2d 853, 857 (11th Cir. 1988).  The district court must, however, ensure that it does not substitute its own judgment on sound educational policy for those made by officials at the state administrative level.  Rowley, 458 U.S. at 206; Walker County School Dist. v. Bennett, 203 F.3d 1293, 1297 (11th Cir. 2000).

## BURDEN OF PROOF

The burden of proof is generally on the party who is objecting to an existing or proposed IEP.  M.M. ex. rel. C.M., 437 F. 3d at 1096 n. 8 (citing Schaffer v. Weast, ----U.S.----, 126 S.Ct. 528, 537, 163 L. Ed. 387 (2005)); Devine v. Indian River County School Board., 249 F.3d 1289, 1292 (11th Cir. 2001).   In the instant case, the Parents are the party objecting to the challenged IEP and, therefore, they bear the burden of proof.

## ISSUES

The Defendant objects to the Court's jurisdiction in this case.  Therefore, the Court will examine that issue first.  According to the School Board, the issue here is moot because there is no case or controversy since both the School Board and the Parents believe that the February 2003 IEP and the February 2004 IEP are not satisfactory to M.M.'s educational needs as they stand today.  The School Board cites Board of Education of Downers Grove Grade School District No. 58 v. Steven L., for the proposition that the issue before the Court is moot. 89 F.3d 464 (7th Cir. 1996).

In Downers Grove, the Seventh Circuit Court of Appeals reversed the District Court holding that the IDEA issue was moot because Steven L. had graduated from the eighth grade and the disputed IEP was remaining from when he was in the fifth grade. Id. at 467.  The Seventh Circuit held that the Court was limited to deciding actual controversies by a judgment that can be executed and not providing opinions upon moot questions or abstract propositions. Id.  The Court  found that the

parents were without "an actual injury traceable to the defendant [that could] be redressed by a favorable judicial decision because the parents had already agreed to a new IEP for the student regarding his high school educational needs. Id. As such, the Seventh Circuit stated that a judgment either way would have no effect on the student because the circumstances effecting his fifth grade IEP were long since past. Id. Therefore, there was no continuing controversy and the issue was determined to be moot. Id.

However, a case may fall into a mootness exception. To fall within the exception to mootness, the alleged injury must be of limited duration and likely to happen again to the same complaining party. Murphy v Hunt, 455 U.S. 478, 482, 102 S. Ct. 1181, 71 L. Ed. 2d 353 (1982). In this case, the facts are different from those presented in Downers Grove. In Downers Grove, a new IEP was in place, and the student was no longer involved with the same school district. Id. at 468. Whereas in the instant case, M.M is still involved with the same school board, the same teachers, and same authorities at TOES. The Lee County School Board still has the authority to modify any IEP involving M.M. Thus, a reasonable expectation exists that the same parties may re-inflict the same alleged injury. Therefore, this case falls into the "capable of repetition yet evading review" exception to the mootness doctrine because the same parties may re-inflict the same alleged injury. Thus, having established that an actual controversy remains active in this matter, under an exception to the mootness doctrine, the Court finds that the Court has the jurisdiction to consider the current case. See 20 U.S.C. § 1415(i)(2)(A); M.M. ex. rel. C.M., 437 F. 3d at 1097 (holding that the IDEA authorizes an aggrieved party to bring an action in federal court).

The Parents claim in their Second Amended Notice of Issues (Index, Vol. 1, pp. 042-045) that the School Board failed to provide M.M. FAPE by: failing to design an appropriate IEP, in that the

IEP's dated February 28, 2003, and February 19, 2004, do not have objective and measurable present levels of performance, annual goals, or short-term objectives, benchmarks, or milestones.  The Parents also claim that the February 28, 2003 and February 19, 2004 IEP's do not have specific amounts of services of special education and related services that were necessary for M.M. listed in a manner that was clear to all involved in the development and implementation of the IEPs, and do not have an appropriate behavioral improvement/support plan.  (Index, Vol. 1, p. 043).

The Parents claim that the School Board failed to consider and include the continuum of special education and related services that would permit M.M. to remain in mainstream classes, including, but not limited to specialized nutritional diet, "sensory" diet, and 1:1 aide.   (Index, Vol. 1, p. 043).  The Parents also claim that the School Board failed to implement an appropriate IEP that was reasonably calculated to provide educational benefit to M.M. in that the IEPs did not implement an appropriate behavioral/support plan, and the School Board failed to provide specialized diet to meet M.M.'s needs, a "sensory" diet to meet M.M.'s needs, a 1:1 aide, sufficient OT services, and sufficient speech/language therapy.  (Index, Vol. 1, p. 043) .  The Parents assert that the School board failed to implement the IEP in the Least Restrictive Environment and called for M.M. to receive services in a VE setting.  (Index, Vol. 1, p. 043).

The Parents claim that the School Board failed to allow M.M.'s parents to fully participate in the decision-making process for determining the appropriate educational needs and services for M.M. by failing to timely provide M.M.'s educational records, and attempting to change M.M.'s placement to a more restrictive environment without parental consent and contrary to M.M.'s needs, and completing the IEP without the parents' participation.  (Index, Vol. 1, pp. 043 - 044).

<u>(a) Alleged Procedural and Substantive Flaws in IEP</u>

<u>(1) Statement of Present Levels of Performance</u>

The Parents' Second Amended Notice of Issues contended that FAPE was denied to M.M. because the IEP's dated February 28, 2003, and February 19, 2004, did not include objective and measurable present levels of educational performance. They argue that the statement of present levels of educational performance should accurately describe the effect of M.M.'s disability on M.M.'s performance in any area of education that is affected, including academic and non-academic areas.

The ALJ found fault with both the February 2003, and the February 2004 IEPs because of a lack of "objective standards for assessing the student's current level of performance" and because there was "no objectively measurable continuity in the present level of performance and progress from one IEP to the next."  (FO pp. 17-19, ¶¶ 52-53).

Pursuant to 34 C.F.R. § 300.347 (1), the IEP for each child must include "a statement of the child's present levels of educational performance".   34 C.F.R. § 300.347(a)(2), the section that addresses annual goals specifically calls for "a statement of measurable annual goals, including benchmarks or short-term objectives..."  It appears that the Parents and the ALJ are confused in that the IEP must include a statement of the child's present levels of educational performance (PLEP), but not objective and measurable statements of PLEP.  The objective, measurable goals come into play at the annual goals stage.  The PLEP is to serve as a starting point from which objectively measurable goals for the ensuing period can be created.

The February 19, 2004 IEP, (Pet. Ex. H [000020], sets forth M.M.'s PLEP in the subsections under the Present Level of Educational Performance section entitled Curriculum and Learning, Social,

Behavior Plan, Independent Functioning, and Communication.   For example, under the
Communication section of the IEP, it is noted that:

> M.M. is able to follow multi-step directions with cuing.  He is demonstrating strong
> verbal skills.   M.M. is able to appropriately sequence events and use functional
> vocabulary to answer and ask questions, label and formulate simple paragraphs. (Pet.
> Ex. H [000020]).

It is clear that the requirements of the regulations have been met in regard to the February 19, 2004
IEP in that this is a statement of M.M.'s present level of educational performance.

Regarding the February 28, 2003, IEP or the Kindergarten IEP, (Pet. Ex. H [000062]), the
same is true.  For example, under the Communication section of the document (Pet. Ex. H [000062]),
the School Board notes that "M.M. produces all sounds correctly except (j, th, and r).  He is
beginning to understand several spatial concepts (ex. behind, in front of, around, between), and
temporal concepts (first, next, last)." Again, it appears from these sections of the IEP that they do
state M.M.'s present level of educational performance.  Therefore, the Court fails to find a deficiency
in the PLEP section of either of the IEP's under discussion.

(2) Statement of Annual Goals and Objectives

As previously stated,  34 C.F.R. § 300.347(a)(2) requires that annual goals be "measurable,"
and that they must include "benchmarks or short-term objectives".  The February 19, 2004, IEP
contains goals and short-term objectives.  For example, in his classroom, the annual goal is:  "M.M.
will develop written language skills to include printing all 26 letters of the alphabet, independently
print first and last name with appropriate size and spacing, and will appropriately print words with
appropriate size and spacing at a 90% rate."  (Pet. Ex. H [000063]).

Regarding the February 28, 2003, IEP, the Annual Goal states that "M.M. will display reading
skills at a 1.5 reading level according to the Sunshine State Standards." (Pet. Ex. H [000021]).  In

both the February 19, 2004, and the February 28, 2003, IEP's, (Pet. Ex. H [000018 - 000027] and

Pet. Ex. H [000061-000068]) the members of the team set forth the Statement of Annual Goals and

Objectives for their area of expertise as well as support roles for the Parents.

      Therefore, the Court finds that M.M.'s annual goals and objectives listed in the February 19,

2004, and the February 28, 2003, IEPs were measurable and included benchmarks or short term

objectives.

(3) Amount and Frequency of Occupational Therapy

      The Parents assert that M.M. is in need of OT services in a greater amount than the two hours

per month provided in the February 19, 2004, IEP.   M.M.'s private occupational therapist, Mary

Fellenz, testified at the hearing that "I recommend that he needs – could benefit from occupational

therapy twice a week, with a half an hour each treatment time." (T-6/8/04 , pp. 115-116).  The ALJ

accepted Ms. Fellenz as an expert in occupational therapy over the objection of the School Board.

(T-6/8/04), pp. 104-111).  The School Board objected on the grounds that she was qualified as an

expert in occupational therapy only from the clinical standpoint.  (T-6/8/04, pp.104-111).

      Ms. Fellenz testified that it was her understanding that whatever would be beneficial to a

student with disabilities is what the school district has to provide.  (T-6/8/04, p. 180) She further

demonstrated her lack of understanding of the IDEA by stating that the school district is required to

maximize the potential of  students with disabilities.  (T-6/8/04, pp. 180-181).  Further, her

recommendations regarding M.M.'s needs were based upon that goal. (T-6/8/04, p. 181).  Although

she cited her recommendation, it is clear from the record that she neither observed M.M. in the

classroom setting between August 2003 and May 2004 (T-6/8/04, p. 176), nor reviewed any records

to determine how he was doing in school.  (T-6/8/04, p. 182).

Ms. Fellenz further concedes that M.M. is actually getting OT service throughout the day at school in addition to his specified OT time of 2 hours per month. (T-6/8/04, pp. 197-198). For example, when M.M. is doing a classwork assignment that requires handwriting, it is addressing his OT if the teacher is aware of what he is writing, watching him, and making sure that he is using the correct pencil and his grip is okay, and that his is actually doing it.[15] Despite not having as much time as she would like with M.M., she indicated that he has made meaningful progress with her. (T-6/8/04, p. 168).

The ALJ found that M.M.'s school performance "improved" on days when he had private OT service before school, but that "His performance regressed on other days." (FO p. 214, ¶ 48). FAPE is not modified by the efforts the parents make to provide their child with additional help. M.M. was already receiving OT services from within the School Board as agreed by the IEP team, and any additional services the parents took it upon themselves to provide for their child should not be imputed to the school district. M.M. ex. Rel. C.M., 437 F.3d at 1101 (holding that if the school board offers a child FAPE then it is not responsible for other private services). FAPE does not require the School Board to provide the best or most desirable program for a child. Id. at 1103.

Ronna Miranda, contractor occupational therapist with the Lee County School System, testified that the amount of OT time which is needed to meet a student's educational goals is determined by reviewing the student's progress (T-6/14/04, pp. 129-130), with the assistance of an evaluative instrument titled Criteria for Educationally Relevant Therapy (CERT), which is completed by the occupational therapist. (T-6/15-04, pp. 132-135). The occupational therapist participates in

---

[15]In her testimony, M.M.'s teacher, Janet Pineau, stated that she does watch what he is writing and how he is writing it, and corrects him when necessary. (T-6/22/04 pp. 176-178).

the IEP meeting, and the level of service is discussed by all team members.(T-6/15/04, pp. 127-129).

Specifically referring to the IEP of December 19, 2003, continuing and concluding on February 19, 2004, Ms. Miranda opined that M.M. should have two hours per month of OT.  That was the same amount of services that he had been receiving in the previous IEP of February 28, 2003. (T-6/14/04, p. 127).  She felt that he was still qualified for OT services because he was exhibiting difficulty in writing.  (T-6/14/04, p. 127).  She discussed her recommendation with the IEP team which included M.M.'s parents.  At no time during that discussion did anyone object to the amount of OT time being recommended.  (T-6/14/04, pp. 128-129).  She did not believe that M.M. needed more time in order to achieve FAPE.  (T-6/14/04, p. 153).

Regarding the February 28, 2003, IEP, the Kindergarten IEP, both Ms. Fellenz, and Ms. Miranda were present for the discussions.  (Pet. Ex. H [000067]).  At not time during the discussions regarding the IEP did anyone dispute the appropriateness of M.M.'s goals or the level of OT service to be provided pursuant to the IEP. (T-6//8/04, p. 177).

The Parents contend in their second argument regarding the OT services that the IEP statement that M.M. should receive OT services for two hours per month is improper.  Rather, they believe that it should be stated in weekly increments.

The ALJ concluded that "neither the existing nor proposed IEP ensures that OT will be provided at weekly intervals.  Rather, each IEP prescribes OT in monthly intervals."  (FO p. 213, ¶49).  However, the ALJ failed to articulate why he made that finding, and failed to cite to the record in support of that finding.

Contrary to the opinion of the parents and the conclusion made by the ALJ, nothing in the law mandates that the frequency of related services be expressed in any particular time increment.

Moreover, there is no evidence in the record that M.M. did not receive the OT services in an appropriate manner.  To the contrary, it was demonstrated through the testimony of the occupational therapist, Ms. Miranda, that M.M.'s OT services were consistently administered in evenly spread sessions.  (Pet. Ex. H [001113-001120]; T-6/14/04, pp. 144-152).

Based upon the foregoing, the Court does not find that there was any shortcoming in the amount and frequency of OT services provided to M.M..  The Court further finds that the level of services did provide FAPE to M.M.

(4) Behavioral Improvement Plan

In the Parents Second Amended Notice of Issues, they assert that the disputed IEP of February 19, 2004, failed to include an appropriate behavioral improvement plan (BIP).  (Index, Vol. 1, at 043).

The ALJ found that the BIP which was completed on February 19, 2004, was untimely and that no evidence adequately explicated the reasons that staff at TOES required approximately five months after the functional behavioral assessment (FBA) to complete a BIP for M.M. (FO p. 211, ¶ 39).  He further found that:

> The BIP was not designed to adequately address the unique needs of M.M.; the BIP failed to identify either immediate antecedent events at school or extended antecedent events in M.M.'s home life that caused behavior problems in school and interfered with educational progress toward the second grade.  (FO p. 211, ¶ 40).

The ALJ also found that:

> ... the omission from the BIP of an adequate study of antecedent events, in relevant part, rendered the design of the proposed IEP inadequate for the unique educational needs of M.M. at the time that the School Board proposed the IEP.  (FO p. 211, ¶ 41).

At the beginning of M.M.'s first grade year, behavioral issues were addressed.  As early as September 4, 2003, the parties discussed the need for a behavioral improvement plan which started with a FBA. (Pet. Ex. H [000391]).   On September 16, 2003, at a Parent Conference, M.M.'s mother gave permission for the FBA to be conducted by the school Behavioral Specialist, Mrs. Fortuna. (Pet. Ex. H [000395]).  It was recommended that the Functional Behavioral Assessment be completed, and that a behavior chart be used to assist with behavior during the next three weeks. (Pet. Ex. H [000396]).

At the Parent Conference on October 16, 2003, it was noted that the "FBA is being completed by Mrs. Fortuna and that she had observed M.M. in class and during times when he was experiencing difficulty."  (Pet. Ex. H [000401]).  It was further noted that "the Behavior Specialist will practice and role model the following skills with M.M.: Understanding feelings of others, taking direction, accepting criticism without displaying anger, and accepting consequences for his actions." (Pet. Ex. H [000401]).

At a Parent Conference on November 6, 2003, the Parties discussed the Parent's questions that were received by FAX on November 3, 2004, regarding M.M.'s behavior.  (Pet. Ex. H [000410-411]).   Although Mrs. Pinneau did not have the behavioral log at the meeting, it was noted that she was continuing to make entries in this log as time permits.  (Pet. Ex. H [000412]).

Even before J.M. signed a consent form for the FBA to take place, on September 11 and 12, 2003, the School Board's behavior specialist, Allison Fortuna, had already begun observing M.M. in his classroom.  She again observed him on October 22, 2003. (Pet. Ex. H [000051-000053]).  As part of the FBA process, she also obtained written interview information from the Parents (September

10, 2003), Ms. Pineau (October, 1, 2003), and from M.M. himself (December 8, 2003).(Pet. Ex. H [00048, 00054-00059]).[16]

On December 19, 2004, the IEP Staffing was conducted.  The IEP was not completed on that date but was continued to February 19, 2004 at the Parents' request.  When the meeting reconvened on February 19, 2004, a Positive Behavior Support Plan was created and included as part of the IEP. (Pet. Ex. H [000024-000025]).

BIPs are not a procedural requisite for an IEP.  The term "behavioral intervention plan" appears in only one part of the IDEA - 20 U.S.C. § 1415(k)(1) which requires a functional behavioral assessment of a child followed by a BIP when disciplinary measures are taken because a child carries or possesses a weapon on school premises or uses or possesses illegal drugs or sells or solicits the sale of a controlled substance while at school.   Clearly, this situation does not apply to the instant case.

In 20 U.S.C. § 1414(d)(3)(B)(i), the IEP team shall consider "in the case of a child whose behavior impedes his or her learning or that of others... when appropriate, strategies, including positive behavioral interventions, strategies, and supports to address that behavior."

It is clear that the staff of the School Board considered the behavior of M.M. and the extent to which it impeded his ability to learn and developed strategies which would address those behaviors. Many of the meeting minutes reflect that M.M.'s behavioral issues were addressed and strategies discussed for dealing with them.  (Pet. Ex. H [000401-000402; 000412;000420]

---

[16]The FBA was written on or about December 1, 2003.  (Pet. Ex. H [00049-00050]).

Thus, the Court finds that a BIP is not a procedural requirement of an IEP and cannot therefore constitute either a procedural or substantive violation.  Alex R. v. Forrestville Valley Community Unit School Dist. #221, 375 F.3d 603, 614-615 (7th Cir. 2004).

(5) Extended School Year Services

The Parents did not specifically raise the issue of extended school year (ESY) services in the Second Amended Notice of Issues.  However,  the ALJ in his Final Order found that both the Kindergarten IEP (February 28, 2003), and the disputed IEP (February 19, 2004), failed to provide for ESY services, despite M.M.'s regression during periods in which he received no service, such as summer breaks and when his Parents discontinued the private OT services they provided in addition to the School Board's services. (FO p. 213, ¶ 47-48).

Pursuant to  34 C.F.R. § 300.309(a)(1) "Each public agency shall ensure that extended school year services are available as necessary to provide FAPE."  Section 300.309 (a)(2) goes on to explain that "Extended school year services must be provided only if a child's IEP team determines, on an individual basis, that the services are necessary for the provision of FAPE to the child.

In the February 28, 2003, IEP or the Kindergarten IEP, ESY services were not recommended based upon the IEP staffing. (Pet. Ex. H [000066]).   The Parents had no objection to the IEP of February 28, 2003. In the disputed IEP or the February 19, 2004, IEP, ESY services were recommended based upon the IEP staffing.  (Pet. Ex. H [000023]).  However, On March 3, 2004, the Parents filed a request for due process. The Parents objected to any change in status and demanded "stay put." (T-5/11/04, p. 180). Therefore, no ESY services were provided to M.M. after that time.

Therefore, the Court finds that ESY services were not required for M.M. pursuant to either the February 28, 2003, or the February 19, 2004, IEP.

(6) Assistive Technology

The Parents claim that M.M. is in need of a computer system and keyboarding skills because of his poor handwriting skills. (T-5/11/04), p. 168). The ALJ in his Final Order agreed with that position, finding that those devices are "necessary to adequately address the unique educational needs of M.M." (FO p. 214, ¶51). He states further that "M.M. does not space adequately between words when he performs handwritten work, but spaces appropriately between words on the computer." and that "[n]either the existing IEP nor the proposed IEP provides assistive technology such as a keyboard and a computer." (FO p. 214, ¶51). Neither the Parents, nor the ALJ have explained how M.M.'s ability to properly space his handwritten work will be enhanced by the use of a computer.

The Parents own expert seems to speak to the contrary. Mary Fellenz, the Parent's OT expert, agrees that handwriting skills are best developed by practicing one's handwriting and by building hand strength. (T-6/8/04, pp. 165-166).

Therefore, the Court finds that the lack of Assistive Technology in regard to M.M. did not deny him FAPE.

(7) Vision Therapy

The Parents contend that M.M. needs vision therapy. The ALJ concluded that vision therapy was "necessary to adequately address the unique educational needs of M.M." because it "greatly improves" his classroom performance. (FO p. 213-214, ¶ 50). Vision therapy is not included in either the February 28, 2003, IEP or the February 19, 2004, IEP. (Pet. Ex. H [000061-000068; 000018-000027])..

-27-

Dr. David F. Delesio, the Parents' expert, performed an initial examination and evaluation on M.M. in November 2003. (T-6/9/04, p. 192). In his report (Pet. Ex. F [000214-000218]), Dr. Delesio recommends that M.M. receive Optometric Vision Therapy in order to give M.M. the "opportunity to develop the necessary visual abilities for academic achievement." (Pet. Ex. F [000117]). He recommended that M.M. be provided with 24 half-hour sessions twice per week in the office and home therapy which would consist of an individualized program designed to enhance the office therapy procedures. (Pet. Ex. F [000218]). His report at no time mentioned the need for vision therapy sessions through the School Board. In fact, when asked at the hearing, Dr. Delesio indicated that he did not recommend any therapy at school. (T-6/9/04, pp. 197-198). He emphasized that the home exercises were "pretty simple" and actually designed for parents to be able to work with their children. (T-6/9/04, p. 220). At no time did Dr. Delesio indicate that it was necessary for M.M. to have vision therapy at school in order to receive meaningful educational benefit from his educational program. In fact, he had no contact with the school in that regard. (T-6/9/04, p. 221). He stated that the time of day at which the exercises are done does not matter. (T-6/9/04, p. 219). Dr. Delesio admitted that he has no training in regard to IDEA protocols, (T-6/9/04, pp. 224-227). He certainly could give no opinion as to whether vision therapy is needed in order to provide FAPE.

The Court finds that vision therapy is a not necessary component of M.M.'s IEP and that there were no flaws in the IEPs as a result of the lack of inclusion of vision therapy services as part of M.M.'s educational plan.

(8) Sensory or Nutritional Diets

In the Second Amended Notice of Issues, the Parents contend that the School Board failed to provide a sensory diet to meet M.M.'s needs.

The ALJ in his Final Order finds that:

> The existing IEP and the proposed IEP failed to provide M.M. with a sensory diet free of gluten and casein that adequately addressed M.M.'s reaction to those ingredients in food and the difficulty M.M. experienced in chewing certain foods due to his small mouth. [The Parents] showed by a preponderance of the evidence that M.M. had a medical necessity for such a diet and that an appropriate diet may reduce inappropriate behavior.  (FO p. 213, ¶46).

However, the ALJ failed to cite to the record in making these findings, and it appears that the ALJ may have combined or confused the sensory diet with that of the gluten and casein free diet.

In addressing M.M.'s need for a sensory diet,  Ms. Miranda, the occupational therapist, prepared a sensory diet for M.M. (Pet. Ex. H. [000039-00040]).   After it was written on November 24, 2003, Miranda brought it to M.M.'s teacher and discussed it with her. (T-6/14/04, pp. 137-138). It is clear from the record that M.M. was provided a number of sensory aids such as a weighted vest, a weighted lap board, a chewy necklace and other devices and techniques to assist in his unique sensory needs.  (T-6/14/04, pp139-143; Pet. Ex. H [000039-000040]).   There is no basis for the Parents to claim that his sensory needs were ignored and no basis from which the ALJ could conclude that M.M. had a "medical necessity" for such a diet.

Regarding the issue of the nutritional diet, as previously stated, the ALJ found a "medical necessity" for such a diet.  There is no evidence in the record that M.M. had a medical necessity for such a diet.[17]  M.M. suffers from microcephaly which impacts the size of his head and/or mouth.

---

[17]The record contains a letter from Dr. J. Robert Cade, a medical doctor who had never seen M.M.(T-6/10/04, pp. 60-61).  Dr. Cade wrote a letter to the Parents on May 23, 2003 describing a special diet they could implement.  (Pet. Ex. H [000622])(emphasis added).  Dr. Cade never testified at the hearing nor was there any evidence introduced from any medical doctor as to the necessity for such a diet.  Dr. Troast, M.M.'s pediatrician never prescribed a
(continued...)

Although there is no evidence that M.M. had a medical necessity for a gluten and casein free diet, the School Board made good faith efforts to assist in the implementation of the nutritional diet requested by the parents.

Kay Johnson, a supervisor and registered dietician for the School Board indicated that she first became aware of M.M. at the end of the 2002 - 2003 school year when the Parents requested a special diet through the principal. (T-6/14/04, pp. 66-67). Although Ms. Johnson made efforts to request information from the parents, she never received any information. (T-6/14/04, pp. 70-73). Despite the lack of information from the parents, Ms. Johnson went to Ada's Health Food Store and purchased some basic initial gluten-free bread, rolls, and some things that they could use to start. (T-6/14/04, p. 74). An account was opened for M.M. in the amount of $500.00 at Ada's. (T-6/14/04, pp. 74-75). On September 5, 2003, Ms. Johnson had a conversation with M.M.'s mother regarding M.M. refusing the food and even throwing it. (T-6/14/04, p. 77). The special diet was discontinued as a result of M.M.'s mother calling Dr. Posey and agreeing that the special diet would be stopped. The record contains several E-Mails which address the issues relating to the special diet.[18]

There is insufficient evidence in the record to suggest that a special diet would have in any way enhanced M.M.'s educational program. There is no evidence of a medical necessity for such a diet or that if a special diet was utilized that it would curb inappropriate behaviors.

---

[17](...continued)
gluten free diet. (T-6/10/04, p. 60).

[18]See Pet. Ex. H [000380, 000382-000383, 000387, 000394, 000397,000604-000628]

-30-

(9) 1:1 Aide

In the Parents Second Amended Notice of Issues, they raised the point that the School Board

failed to consider and include the services of a 1:1 aide for M.M.

Although the ALJ did not cite to any portion of the record, he concluded that "The unique

educational needs of M.M. at the time of the existing and proposed IEPs required a trained adult 1:1

aide." (FO p. 212, ¶ 42).  He further concluded that:

> M.M. had difficulty in class attending to task and difficulty transitioning during the
> school day.  M.M. needed constant prompts, reminders, and redirection to task.  A
> properly trained 1:1 aide would have provided assistance needed to address the
> unique educational needs of M.M.  (FO p. 212, ¶ 43).

> The evidence [the School Boar] submitted to support the argument that a trained 1:1
> aide would be detrimental to M.M. was neither credible nor persuasive.  Although it
> is clear that dependence may begin immediately,  the greater weight of evidence
> showed that properly trained 1:1 aide would implement so-called "fading" techniques
> in a manner that progressively reduced the aide's assistance over time and prevented
> M.M. from being permanently dependent on the aide. (FO p. 212, ¶ 45).

The School Board contended that the use of a 1:1 aide would cause M.M. to be dependent

on that person which would result in more exclusion from the general population than would the VE

classroom setting they were proposing in the IEP of April 28, 2004.  The School Board also

contended that the use of a 1:1 aide would prevent M.M. from making educational progress without

the assistance of an aide.

The record contains numerous references to the use of a 1:1 aide for M.M. and why it was

not recommended.  Deborah Sowa, school psychologist, testified that "one-on-one assistance breeds

learned helplessness and dependency in children." (T-7/15/04, p. 37).  She opined that the point of

ESE services is to support children such that they can be as independent in their functioning as

possible, and a one-on-one assistant hampers that.  It further isolates a child.  It moves them away

-31-

from their peer group and it causes social developmental stagnation. (T-7/15/04, pp. 37-38). A child like M.M. who tended to move away from challenging tasks as it is would look toward the person to assist him in that task rather than stretching his capabilities and putting forth the needed effort to approach whatever the activity is that's presented to him. (T-7/15/04, p. 38).

M.M. did well in a small group setting. In a VE setting, you have teachers who continue to work with the common group to help them to grow and master the skills needed for proper academic and social development. (T-7/15/04, p. 39). Her expert opinion was that in M.M.'s case, the smaller group environment helped provide him with some external boundaries , provided him with the level of support that he needs to control his behavior, to control his focus and attention, to generally be more successful and benefit from the more intensive direct style of instruction that can be provided in such a small setting. (T-7/15/04, p. 36).

Janet Pineau, M.M.'s teacher, observed him in the classroom setting. She indicated that although she did not have a daily aide in her classroom, she frequently had parent volunteers. M.M.'s performance would vary from day to day. Some days he was very cooperative and worked with the parent volunteer. Other days, behavior continued to be an issue. She noted that as the year progressed, M.M. became more reliant on using one-to-one assistance. Even if it was not suggested that he work with a volunteer, he would insist that is what he needed. (T-7/23/04, p. 262). She noted that dependence and tried to fade M.M.'s use of a one-to-one adult. It was a slow process; It was rather difficult. (T-7/23/04, pp. 264-265).

Clearly, the School Board considered the use of a 1:1 aide, but based upon the experts who contributed their opinions at the IEP meetings, discounted the use of the 1:1 aide. The failure to add the assistance of a 1:1 aide to M.M.'s IEPs did not cause him to suffer a loss of FAPE.

10.  Parental Input

_____The Parents claim that although they brought up several suggestions for consideration, including: ESY, 1:1 aide, behavior plan, sensory diet, gluten and casine-free diet, additional time for OT, and vision therapy, that the School Board failed to consider them in the IEP process.  As is evidence by the Court's prior analysis of these issues, many of these suggestions were considered and then implemented for M.M. The parents were present at the IEP staffings and were allowed input. The parents were full participants, even requesting and obtaining an adjournment of the December 18, 2003, meeting for a period of eight weeks to accommodate their request to obtain additional information before the IEP document was completed.

  The record is replete with examples of correspondence between M.M.'s mother and the teachers and administrators of TOES, and the notes of the meetings reflect parental input.  The Court does not find merit in the Parents argument that they were not allowed input.

11.  Failure to Provide Written Notice

The Parents claim that the School Board failed to provide prior written notice to them on multiple occasions over the course of the past two years even after they specifically made requests. There is no issue that the Parents were notified of the dates of the meetings when IEPs would be written, and no issue that they attended each scheduled meeting after receiving notice.  As noted above, the parents were fully involved in the development of M.M.'s IEPs.  *See* Doe v. Alabama State Department of Education, 915 F.2d 651, 661 (11th Cir. 1990) (holding that even if there was any deficiency in notification, it had no impact because the record showed the parents were fully involved in the process).  Thus, the Court finds the Parents' argument lacks merit.

(b)Alleged Flaws in Implementation of IEP

(1) Quarterly Reporting

Although the Second Amended Notice of Issues did not assert an issue of failure to follow

quarterly reporting regarding M.M.'s progress toward his IEP goals and objective, counsel during

the final hearing made mention of the issue.   The ALJ in his Final Order found that "the IEP's are

incomplete, including the boxes for quarterly assessments, and the remaining portions are completed

inconsistently." (FO 215, ¶ 53).

It is clear that on the disputed IEP of February 19, 2004 that the quarterly assessment blocks

are not completed.  (Pet. Ex. H [000018-000027].  Further, on the Kindergarten IEP of February 28,

2003, some of the quarterly assessment blocks are filled out and others are left blank.  (Pet. Ex. H

[000061-000068]).

The law  requires reporting on progress toward goals and objectives on a basis no less

frequent than for non-disabled students.[19]      Nothing in the law sets forth a precise format for the

reporting on a student's progress.  The failure to complete the blocks on the IEP form itself does not

constitute a failure to report on the progress of M.M. toward his goals if that reporting is done in

other ways.

---

[19]Specifically, 934 C.F.R. § 300.347 (a)(7) states that "The
IEP for each child with a disability must include - A statement of
How the child's progress toward the annual goals described in
paragraph (a)(2) of this section will be measured; and (ii) How the
child's parents will be regularly informed (through such means as
periodic report cards), at least as often as parents are informed
of their nondisabled children's progress, of (A) Their child's
progress toward the annual goals; and (B) The extent to which the
progress is sufficient to enable the child to achieve the goals by
the end of the year.

-34-

In this case, M.M. received quarterly report cards which were issued to his parents. (Pet. Ex. H. [000240-000241]). Further, the record contains a multitude of documents with correspondence between the Parents and the school regarding M.M. and his progress. In addition, there were numerous meetings documented in the record and testified to at the hearing which took place between the Parents and the school at which time his progress was discussed. Further, the staff and the Parents engaged in IEP staffings, with full discussion of educational progress, on at least three occasions during the 2003-2004 school year. (December 18, 2003; February 19, 2004; and April 2004).

The Court finds that M.M. was not denied FAPE because of a failure of the staff to completely fill out the quarterly assessment blocks on the IEPs especially in light of the multitude of other ways that the parents were informed of M.M.'s progress..

(2) Production of Educational Records

In their Second Amended Notice of Issues, the Parents assert that the School Board failed to allow M.M.'s parents to fully participate in the decision-making process for determining the appropriate educational needs and services for M.M. by failing to timely provide M.M.'s educational records. 34 C.F.R. §300.501 speaks to this issue. "The Parents of a child with a disability must be afforded... an opportunity to inspect and review all education records with respect to the identification, evaluation, and educational placement of the child; and the provision of FAPE to the child..." (34 C.F.R. § 300.501 (a)(1)(i-ii)).

The record in this case does not include any denial of a right of the Parents to inspect or review any of M.M.'s records. Petitioners' Exhibit H numbers 1120 pages of records provided to the Parents by the School Board in response to their request. The Parents introduced Petitioners'

-35-

Exhibit G which is comprised of a weekly log/communication between the school and the Parents and includes notes by both the classroom teacher and the Parents themselves.[20]  There is no indication that this paperwork should be maintained as part of a student's records.

The ALJ concluded in his Final Order that "One of the objective standards identified for measuring progress is the student's actual work and test scores.  However, teachers at Three Oaks routinely destroyed much of that work before the commencement of the due process hearing."  (FO p. 214, ¶ 53).  The ALJ went on to further state that:

> [School Board] destroyed or lost some of the educational records for M.M.  Teachers at Three Oaks maintain a student portfolio that includes actual work samples for M.M. and his test results.  Actual work samples and test results comprise one of the objective standards for measuring M.M.'s educational progress toward his annual goals.  In addition, the records produced by [the School Board] failed to include correspondence from [the Parents] to the school evidencing the medical necessity for a sensory diet for M.M.  (FO p. 215, ¶ 55).

The term "educational records" is defined by § 6A-1.0955(5)(a), F.A.C., as including Category A records[21] (Verified information of educational importance which shall be retained permanently), and Category B records (verified information of educational importance which is

---

[20]Petitioners' Exhibit G is a compilation of paperwork that is sent home to the family at the end of each day and is to be signed by the parent.  It includes such information as homework for the week, spelling words, and behavior issues.  (T-6/9/04, p. 50).

[21]Content of Category A records includes (1) Pupil's or student's full legal name; (2) Authenticated birth date, place of birth, race and sex; (3) Last known address of the pupil or student; (4) Names of the pupil's or student's parent or guardian; (5) Name and location of last school attended; (6) Number of days present and absent, date enrolled, date withdrawn; (7) Courses taken and record of achievement, such as grades, units, or certification of competence; () Date of graduation or date of program completion.

subject to periodic review and elimination, when the information is no longer useful).  The term

"records" in the context of student records is also statutorily defined by § 1002.22(2)( c), Fla. Stat.[22]

The argument that disposal of work papers constitutes a failure to permit access to

educational records simply does not apply.  Nowhere does the statutory definition call for classwork

papers to become part of the student's record. The School Board made available to the Parents the

"Educational Records" of M.M.

(3) M.M.'s Intelligence Quotient and Its Impact on His Ability to Perform In a Classroom

The ALJ made a finding that "M.M. has an intelligence quotient (IQ) in excess of 100." "He

is capable of achieving appropriate educational goals, and is capable of progressing from grade to

grade." (FO p. 209, ¶ 31).

During its case in chief, the School Board called Deborah Sowa, a school psychologist.  She

was accepted as an expert in Evaluation, Diagnosis and Programming Recommendations for Students

---

[22]"Records" and "reports" mean official records, files, and data directly related to students that are created, maintained, and used by public educational institutions, including all material that is incorporated into each student's cumulative record folder and intended for school use or to be available to parties outside the school or school system for legitimate educational or research purposes.  Materials that shall be considered as part of a student's record include, but are not necessarily limited to: identifying data, including a student's social security number; academic work completed; level of achievement records, including grades an standardized achievement test scores; attendance data; scores on standardized intelligence, aptitude, and psychological tests; interest inventory results; health data; family background information; teacher or counselor ratings and observations; verified reports of serious or recurrent behavior patterns; and any other evidence, knowledge, or information recorded in any medium, including, but not limited to, handwriting, typewriting, print, magnetic tapes, film, microfilm, and microfiche, and maintained and used by an educational agency or institution or by a person acting for such agency or institution.

with Difficulties in Learning Related to Cognitive Functioning, Processing, Behavior and Related Learning Disorders.  (T-7/15/04, pp. 5 - 15).  According to Ms. Sowa, M.M.'s most recent evaluation found M.M. to have "cognitive functioning within the low end of the average range." "He attained a full scale IQ of 90... which places him at the 25th percentile."  (T-7/15/04, p. 17).  She testified that M.M. is a child "who is able to function at or above 25 out of every 100 of his peers, same-aged peers, and also his capabilities are less developed than 75 out of those 100 same-aged peers."  (T-7/15/04, p. 17).  The "average range is 90 - 110."  (T-7/15/04, p. 17).

The record also contains information from Peter Piro, School Psychologist, who performed a Psychological Evaluation on M.M. on October 23, 2003, and found that M.M. had a full scale IQ of 90.  (Pet. Ex. H [000031]).

The Parents at the hearing presented the testimony of John Christopher McGinnis, Ph.D., a clinical psychologist whose opinion was that M.M.'s IQ is somewhere in a range of 95-120 despite the prior evaluation results.  Dr. McGinnis based his conclusion on the classroom teacher's rating of intellect at the 85th - 95th percentile.  (T-7/26/04, pp. 22-23).   He admitted, however, that his opinion would change if the teacher had actually intended to mark M.M.'s raw score on the IQ test as 85-95, as opposed to his percentile.  (T-7/26/04, p. 84).   In fact, in Janet Pineau's testimony, she indicated that she filled out the Lights Retention Scale on February 23, 2004, and erroneously marked his intelligence as 85th - 95th percentile, when she really had intended to indicate that his raw score was around 90.  (T-7/23/04, pp. 259-260).

In Ms. Sowa's expert opinion, a child with an IQ at the 25th percentile would normally show academic skills at about the 25th percentile as well, so they would be below the exact age expectancy for the child's chronological age.  (T-7/15/04, p. 20).  She was also asked her expert opinion

regarding the reasonable expectations for academic performance at age-equivalent grade level for a student who has all of the these problems; that is, the IQ of 90, learning disabilities, speech and language impairments and behavioral issues.  (T-7/15/04, p. 22).  She opined that when "we have a child who has that multitude of issues that... plays a part in daily skill acquisition, learning, attention, motivation."  "It's just a series of hurdles that make the progression slower, make the level of assistance that they need to gain the knowledge and the skills even greater to accommodate and to address those concerns."  (T-7/15/04, p. 22).  She was also asked in her expert opinion if a student who had these problems would be on age-equivalent grade level at the end of the first grade year. Her opinion was that the child would not.[23]  (T-7/15/04, p. 23).

The ALJ concluded that M.M. has an IQ in excess of 100.  He also concluded that "he is capable of achieving appropriate educational goals, and is capable of progressing from grade to grade."  (FO p. 209, ¶ 31).  The ALJ further found that "The existing IEP (the February 28, 2003, IEP, or the Kindergarten IEP), was neither designed nor implemented to adequately address the unique needs of M.M. during that part of the 2003-2004 school year in which the IEP was in effect." He goes on to state that "During the first grade, M.M. made meaningful progress toward the educational goals and benchmarks in the existing IEP.  At the end of the 2003-2004 first grade school year, however, [the School Board] retained M.M. in the first grade and did not promote M.M. to the

---

[23]She indicated that "what we need to look at with a child – when we're looking at meaningful educational benefit, we need to look at the level of growth, if growth is being made, if issues are being addressed relative to capabilities of this child to learn, function socially, function academically, function independently. To... lean toward the ultimate long-term goal which is having a functional adult, an adult whose not only literate, whose not only got the basic academic capabilities and skills mastered, but is also able to be a productive member of society." (T-7/15/04, p. 23).

second grade.  Thus, the existing IEP was not designed so that M.M. could make meaningful progress toward his educational goals and progress to the second grade."

The ALJ did not cite to the record.  His finding is contrary to the facts in the record and the facts developed at the hearing.  To the extent that the information that  Dr. McGinnis received and processed to opine that M.M.'s IQ was somewhere in the range of 95-120 was faulty, the ALJ's conclusion is also faulty.

The elements of FAPE are analyzed at the time the IEP is prepared, not by hindsight at a later date.  FAPE is also not measured by whether one progresses on schedule to the next grade level, but is determined by whether the student receives meaningful educational benefit from the educational opportunities provided by the IEP.  Rowley, 458 U.S. at 176. M. M. did make educational progress despite the recommendation not to promote him from first to second grade in May 2004 especially when taking into account his cognitive and other limitations.

(4) Meaningful Educational Progress

Although the ALJ did not cite to the record, in his Final Order he found that "[a]t the conclusion of the kindergarten year, M.M. had made substantial educational progress in letter identification, math, language, and pre-reading skills."  (FO p. 202, ¶ 9).  He also found that "M.M. understood ordinal numbers, money and time.  He could compare small groups of objects.  He could complete patterns and could perform simple addition and subtraction.  M.M. had achieved 75 - 85 percent of his kindergarten goals by the time he began the first grade."  (FO pp. 202-203, ¶ 10).

The ALJ found that "The existing IEP was designed and implemented to adequately address the unique needs of M.M. for the entire kindergarten year."  (FO p. 209, ¶ 33)

"Although M.M. experienced behavioral problems, he achieved his educational goals and progressed from kindergarten to the first grade." (FO p. 209, ¶ 33). The ALJ commented that "During the first grade, M.M. made meaningful progress toward the educational goals and benchmarks in the existing IEP." (FO p. 210, ¶ 34). He further stated that "Between February 19, 2004, and April 4, 2004, M.M. improved significantly in classroom behavior and performance. M.M. remained seated and focused in the classroom." (FO p. 216, ¶ 58).

The ALJ found that "By April 28, 2004, M.M. maintained very good interaction with peers. The student's ability to maintain self control had improved significantly." (FO p. 217, ¶ 59). He found that "M.M. followed classroom routines without difficulty. He displayed some organizational problems, but those were within the normal range of first graders. M.M. worked independently, but continued to need periodic, rather than constant, assistance to complete academic work." (FO p. 217, ¶ 60). The ALJ also concluded that "On April 28, 2004, toward the end of the first grade, M.M. had improved his educational performance in curriculum and learning. M.M.'s strengths continued to be in math and science, and his letter recognition was near 85 percent." (FO p. 217, ¶ 61). Although, "M.M. scored 64 percent on a phonogram test. He could decode 67 percent of the words from the first of six books used for the first grade. (FO p. 217, ¶ 62). "M.M. could write a short paragraph with three to four word sentences, using correct sentence structure. (FO p. 217, ¶ 63).

The ALJ concluded that:

The preponderance of evidence does not show that the problems M.M. experienced in classroom behavior and performance prior to February 19 2004, were caused either individually or severally by: deficiencies in the design and implementation of the existing IEP; deficiencies in the design of the proposed IEP; or procedural violations. The greater weight of evidence shows that, between, February 19, and April 28, 2004,

-41-

medication for ADHD resulted in a significant improvement in M.M.'s classroom
behavior and educational performance.        (FO p. 218, ¶ 64).

The ALJ further concluded that:

... the preponderance of evidence does not show that the procedural violations
committed by [the School Board] resulted in a loss of educational opportunity for
M.M., seriously infringed the parents' opportunity to participate in the IEP
formulation process, caused a deprivation of educational benefits for M.M.,
undermined the very essence of the IDEA, or resulted in the denial of FAPE.  The
greater weight of evidence shows that M.M. made meaningful educational progress
after the procedural violations when M.M. began medication for his ADHD. (FO p.
224, ¶ 78).

Based on the ALJ's Findings of Fact and Conclusions of Law he Ordered that "The

educational progress M.M. made in the latter part of the first grade after he began medication, while

the IEP deficiencies and procedural violations were operative, precludes a finding based on a

preponderance of the evidence that the deficiencies and violations, either jointly or severally,

prevented M.M. from making educational progress during the portion of the first grade that preceded

the start of medication.  (FO p. 225).

Under the Rowley standard, the Supreme Court outlined that an IEP which is reasonably

calculated to provide meaningful educational progress is substantively appropriate.  IDEA requires

school districts to provide a floor of opportunity, and maximization of potential is never required.

CONCLUSION

The Court finds that the School Board complied with the procedures set forth in the Act.

The individualized educational program developed through the Act's procedures was reasonably

calculated to enable M.M. to receive educational benefits.   Because these requirements are met, the

School Board has complied with the obligations imposed by Congress and the courts can require no

more.  Based upon those findings and the findings and conclusions of this Court, this Court does not find a denial of FAPE as to the February 28, 2003, Kindergarten IEP.

As a result of the findings of fact and the conclusions of law set forth above, as well as this Court's de novo review of the record, with due deference to the ALJ's Final Order, and with due deference to the expertise of the appropriate educational officials, it is

**RESPECTFULLY RECOMMENDED:**

(1) Regarding Case No. 2:05-cv-5-FtM-29SPC the Plaintiff School Board of Lee County ("School Board"), Florida's Amended Complaint (Doc. #7) it is **respectfully recommended** that Judgment Should be Entered in Favor of the Plaintiff Lee County School Board and against the Defendant M.M. on behalf of M.M. II, a Minor.  The Final Order of the ALJ should be **REVERSED** in accordance with the Findings of Fact and Conclusions of Law.

(2) It is further **respectfully recommended** that the case styled M.M. and J.M ("the Parents"), on behalf of M.M. II, a minor v. School Board of Lee County, Florida, 2:05-cv-7-FtM-29SPC should be **DISMISSED as moot.**

**Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.**

**Respectfully recommended** at Fort Myers, Florida, this ___17th___ day of March, 2006.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record